UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

KRISTINE ORLOB-RADFORD, and all others similarly situated,

Plaintiff,

vs.

MIDLAND FUNDING LLC, ENCORE CAPITAL GROUP, INC, and MACHOL & JOHANNES, PLLC,

Defendants.

NO. 2:15-CV-00307-JLQ

ORDER RE: MOTION TO COMPEL ARBITRATION, MOTION TO STRIKE, AND REQUEST TO UNSEAL DOCUMENTS

## I.    Introduction

BEFORE THE COURT is the Defendants Machol & Johannes, PLLC, Midland Funding LLC, and Encore Capital Group, Inc.'s (collectively "Defendants") Motion to Compel Arbitration (ECF No. 12); Plaintiff's Motion to Strike contained within a footnote in her Response to the Motion to Compel Arbitration (ECF No. 45 at 8 n.1); and Plaintiff's request to unseal the Loan Sale Agreement between FIA Card Services, N.A., and Defendant Midland Funding LLC contained within her Motion to Seal (ECF No. 40 at 2).

Through the Motion to Compel Arbitration, Defendants seek to enforce an arbitration clause allegedly governing Plaintiff's account. Plaintiff opposed the Motion. (ECF No. 45). Defendants filed a Reply. (ECF No. 48).

In the Motion to Strike, Plaintiff seeks to strike the 2003 Cardholder Agreement submitted with the declaration of Michael Burger. Defendants filed a Response. (ECF No. 52). Plaintiff filed a Reply. (ECF No. 55).

Plaintiff requests the court to unseal the Loan Sale Agreement because, she asserts, there is no reason to keep it under seal. Defendants opposed the Motion. (ECF No. 51). Plaintiff filed a Reply. (ECF No. 54).

The Motions were submitted to the court for hearing without oral argument. This Order memorializes the court's ruling.

## II.    Factual Background

On July 22, 2003, Plaintiff opened a credit card account with Bank of America ending in the numbers 4251. (ECF No. 14 at ¶3). The account was charged off on November 29, 2006, and assigned a new account number ending in 8265. (ECF No. 14 at ¶3).

In connection with the Motion to Compel Arbitration, Defendants submitted the declaration of Michael Burger, the Director, Operations for Midland Credit Management, Inc. (ECF No. 14). Attached to Burger's declaration was a 2003 Cardholder Agreement which Defendants assert governed Plaintiff's Bank of America account. *See* (ECF No. 14 at 15-16). The Cardholder Agreement states:

> Any dispute, claim, or controversy ("Claim") by or between you and us (including each other's employees, agents or assigns) arising out of or relating to this Agreement, your Account, or the validity or scope of any provision of this Agreement including this arbitration clause shall, upon election by either you or us, be resolved by binding arbitration. Arbitration shall take place before a single arbitrator on an individual basis without resort to any form of class action. Arbitration may be selected at any time unless a judgment has been rendered or the other party would suffer substantial prejudice by the delay in demanding arbitration.
>
> ...
>
> YOU UNDERSTAND AND AGREE THAT IF EITHER YOU OR WE ELECT TO ARBITRATE A CLAIM, THIS ARBITRATION SECTION PRECLUDES YOU AND US FROM HAVING A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH COURT, OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS. EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST BE RESOLVED THROUGH ARBITRATION IF YOU OR WE ELECT TO ARBITRATE.

(ECF No. 14 at 15) (emphasis in original).l

On March 28, 2011, Midland Funding LLC purchased Plaintiff's account from FIA Card Services, N.A. as part of a transaction acquiring a portfolio of accounts. (ECF No. 14 at ¶3); (ECF No. 46). Section 4.4 of the Loan Sale Agreement between FIA Card Services and Midland states:

> Buyer [Midland] acknowledges and agrees that any claim, dispute or action against an Obligor of a Loan shall be resolved by arbitration or litigation pursuant to the terms and conditions of the underling loan agreement between Seller [FIA Card Services] and such Obligor, which is assigned to and assumed by Buyer, pursuant to the terms of this Agreement.

(ECF No. 46 at 11). The next sentence in Section 4.4 states: "If an arbitration option or class waiver was provided in the original terms and conditions, the enforcement of such arbitration or class waiver clause is not permitted." (ECF No. 46 at 11).

Section 9.3 of the Loan Sale Agreement states in part:

> BUYER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE LOANS WAS OR WILL BE OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE OR WILL NOT BE OBLIGATED TO MAKE AN INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND SELLER MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION, EXCEPT AS OTHERWISE PROVIDED IN SECTION 8.3 OF THIS AGREEMENT.

(ECF No. 46 at 20) (emphasis in original). Section 8.3 contains limited warranties relating to: (1) legal standing of FIA Card Services, N.A.; (2) execution of the Loan Sale Agreement being duly authorized; (3) the binding nature of the Loan Sale Agreement and its obligations being enforceable as against FIA Card Services, N.A.; (4) no requirement of governmental approval in connection with the execution of the Loan Sale Agreement; (5) no governmental approval needed for sale of the accounts being transferred in the Loan Sale Agreement; (6) good and marketable title to the accounts free of all liens; (7) origination and servicing of the accounts being in compliance with all applicable state and federal laws; (8) accuracy of the loan principal balance; (9) accuracy of information regarding account number, book value, accountholder names, addresses, and Social Security numbers, charge-off dates, principal and interest amounts and date of last

payment; (10) no pending litigation regarding any of the accounts; and (11) substantial compliance with state and federal consumer credit laws, including the Truth-in-Lending-Act, Equal Credit Opportunity Act, the Fair Debt Collection Practices Act, and the Fair Credit Billing Act in the servicing and collection of loans on the accounts. (ECF No. 46 at 17-19).

On February 23, 2010, Bank of America entered a settlement agreement in *Ross v. Bank of America, N.A, (USA) et al.*, 05 CV 7116 (WHP) (S.D. N.Y.). (ECF No. 20 at 46-47). The class in that case was defined as "all persons holding during the Period in Suit a Credit Card under a United States Cardholder Agreement ... subject to an Arbitration Clause relating to their cards." (ECF No. 20 at 18). The period in suit was defined as "the period from the first Bank Defendant's adoption of an Arbitration Clause in its consumer Credit Card agreement through the date of execution of this Settlement Agreement." (ECF No. 20 at 14).

As part of the settlement agreement, Bank of America agreed to remove "any and all Arbitration Clauses and the Class Action Waiver Clauses" from cardholder agreements by "mailing new agreements, change-in-terms notices or other form of notice to ... all of its Consumer/Small Business Credit Card cardholders who will receive a 2010 annual privacy notice pursuant to 12 C.F.R. § 40.5." (ECF No. 20 at 16). Bank of America further agreed to "not restore or otherwise insert ... an Arbitration Clause or a Class Action Waiver Clause within three and one half (3.5) years following May 1, 2010." (ECF No. 20 at 16).

Bank of America also agreed it "will not seek to enforce an Arbitration Clause or Class Action Waiver Clause against a member of the Settlement Class based on currently existing or pre-existing United States Cardholder Agreements" subject to some exceptions which are not applicable in the instant matter. (ECF No. 20 at 16). This provision also applied to "any Bank of America Consumer/Small Business Credit Card cardholder agreement, account or obligation that Bank of America transfers or assigns to a third party after February 1, 2010." (ECF No. 20 at 29).

ORDER - 4

Unless otherwise provided for, the terms of the settlement agreement expired "five (5) years after the date of execution of this Settlement Agreement." (ECF No. 20 at 30).

### III.    Discussion

The Federal Arbitration Act ("FAA") provides arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). The district court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

"[G]ateway questions of arbitrability, such as whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy" ordinarily "remain within the province of judicial review." *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011). However, "[a]lthough gateway issues of arbitrability presumptively are reserved for the court, the parties may agree to delegate them to the arbitrator." (*Id.*).

"Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (brackets in original) (quoting *A T & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986)). Evidence which meets this standard of proof "might include ... a course of conduct demonstrating assent ... or ... an express agreement to do so." *Momot*, 652 F.3d at 988 (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 79-80 (2010) (Stevens, J., dissenting)). Language delegating the authority to arbitrators to determine "the validity or

application of any of the provisions of" the arbitration clause constitutes a clear and unmistakable agreement to arbitrate the issue of arbitrability. *Momot*, 652 F.3d at 988.

**A.    The 2003 Cardholder Agreement**

The 2003 Cardholder Agreement was submitted as an attachment to the Declaration of Michael Burger, the "Director, Operations for Midland Credit Management, Inc.," who manages information and records for Midland Funding, LLC. (ECF No. 14 at ¶1). The 2003 Credit Agreement was part of the collection of records produced by FIA Card Services in connection with the purchase of Plaintiff's account. *See* (ECF No. 14 at ¶8). Plaintiff disputed the accuracy of the Cardholder Agreement produced by Defendants and moved, in a footnote, to strike the document. *See* (ECF No. 45 at 8 n.1).

The court agrees with the Seventh Circuit's observation as to why motions to strike are seldom appropriate: motions to strike "serve no purpose except to aggravate the opponent—and though that may have been the goal here, this goal is not one the judicial system will help any litigant achieve. Motions to strike disserve the interest of judicial economy. The aggravation comes at an unacceptable cost in judicial time." *Redwood v. Dobson*, 476 F.3d 462, 471 (7th Cir. 2007).

In the context of motions for summary judgment, the court may consider any evidence, even if inadmissible in its current form, provided it can be presented in an admissible form at trial. *See* Fed.R.Civ.P. 56(c)(2); *Singleton v. Lopez*, 577 Fed. Appx. 733, 736 (9th Cir. 2014) (unpublished). Some courts have applied this rule to evidence submitted in support of motions to compel arbitration. *See Delgado v. Ocwen Loan Servicing, LLC*, 13-CV-4427 (NGG) (ST), 2016 WL 4617159 at *7 (E.D. N.Y. September 2, 2016); *Dillon v. BMO Harris Bank, N.A.*, --- F. Supp. 3d ---, 2016 WL 1175193 at *3 n.3 (M.D. N.C. March 23, 2016). The Ninth Circuit considers motions to compel and motions for summary judgment to have the same effect and be the "functional equivalent" of each other in the context of arbitration clauses. *See Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008). In light of this case law,

the Cardholder Agreement may be considered by the court if it is currently admissible or could be presented in an admissible form at trial.

Defendants argue the Cardholder Agreement is admissible because it is an operative contractual document and not hearsay. (ECF No. 52 at 4). "[O]ut-of-court statements that are offered as evidence of legally operative verbal conduct are not hearsay. They are considered 'verbal acts.'" *U.S. v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004). If the out-of-court statement's "significance lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.... The effect is to exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parities [sic] or is a circumstance bearing on conduct affecting their rights." *Stuart v. UNUM Life Ins. Co. of America*, 217 F.3d 1145, 1154 (9th Cir. 2000) (quoting Fed.R.Evid. 801(c), advisory committee's note) (emphasis removed). For example, an insurance policy, is "excluded from the definition of hearsay and is admissible evidence because it is a legally operative document that defines the rights and liabilities of the parties in this case." *Stuart*, 217 F.3d at 1154; *see U.S. v. Bellucci*, 995 F.2d 157, 161 (9th Cir. 1993) (holding a certificate of insurance, which "[l]ike a written contract that memorializes the fact of a legal agreement" is not hearsay under Fed.R.Evid. 801(c).). It appears the Cardholder Agreement falls within this exception to hearsay.

Defendants also assert the Cardholder Agreement should be admitted as a business record under Fed.R.Evid. 803(6). (ECF No. 52 at 4-9). "A record of an act, event, condition, opinion, or diagnosis" is admissible if: (1) the record "was made at or near the time by–or from information transmitted by–someone with knowledge"; (2) the record was kept "in the course of a regularly conducted activity of a business, organization, occupation, or calling ,whether or not for profit"; (3) making the record "was a regular practice of that activity"; (4) the above conditions "are shown by the testimony of the custodian or another qualified witness"; and (5) the opposing party "does not show that the source of information or the method or circumstances of preparation indicate a lack of

trustworthiness." Fed.R.Evid. 803(6).

Documents may be admitted as business records of an entity even where the documents were prepared by a third party, provided the other requirements of Fed.R.Evid 803(6) are met. *U.S. v. Childs*, 5 F.3d 1328, 1333-34 (9th Cir. 1993). The witness does not need to be the actual custodian of the documents, as they only need to "understand the record-keeping system." *U.S. v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990); *see Childs*, 5 F.3d at 1334.

In *Childs*, former employees of auto dealerships testified and introduced documents, including certificates of title, purchase orders, and odometer statements, which were not created by the auto dealerships but were part of the auto dealerships' records. (*Id*. at 1333-34). The Ninth Circuit held those documents were properly admitted as business records of the auto dealerships where the witness testified the documents were kept and relied upon in the auto dealerships' regular course of business. (*Id*. at 1334).

On the other hand, where the testifying witness is trying to establish the document as a business record of a different entity, the witness must have knowledge regarding the record-keeping of the entity which prepared the document. *See N.L.R.B. v. First Termite Control Co., Inc.*, 646 F.2d 424, 427-28 (9th Cir. 1981). In *First Termite*, the witness testified regarding a freight bill received by the witness' employer from a third party. (*Id*. at 425-26). The bill was being offered to show the location where the freight originated. (*Id*.). The witness knew nothing of how the freight bill was created or maintained. (*Id*. at 428). The location where the freight originated was of no concern to the witness or their business. (*Id*.).

The Ninth Circuit held the freight bill was improperly admitted because the testifying witness failed to establish the business record foundation. (*Id*. at 429-30). In distinguishing its holding from other cases involving third parties' business records, the Ninth Circuit noted the businesses in other cases "had a substantial interest in the accuracy of the portion of the records at issue." (*Id*. at 429). In contrast, the testifying

witness in *First Termite* "was indifferent as to the origin of this lumber, and had no interest in the accuracy of that portion of the freight bill." (*Id.*); *see also*, *Childs*, 5 F.3d at 1334 n.3 (distinguishing *First Termite* because the auto dealerships had "substantial interest" in the accuracy of the documents).

Regarding records not created by Defendants, Burger parroted the foundational language of Fed.R.Evid. 803(6), but provided no basis to show how he knew those records were created in the ordinary course of business by the third party businesses. *See* (ECF No. 14 at ¶2). Especially in the context of testimony regarding other businesses, this court will not accept Burger's conclusory statements as foundation to establish the Cardholder Agreement as a business record of FIA Card Services, N.A. *See Rogers v. Oregon Trail Elec. Consumers Co-op., Inc.*, No. 3:10-CV-1337-AC, 2012 WL 1635127 at *9 (D. Or. May 8, 2012) (requiring more than "boilerplate, conclusory statements that simply parrot the elements of the business record exception to the hearsay rule") (citation omitted).

However, the Cardholder Agreement may be admissible as a business record of the Defendants through the testimony of Burger. As part of his job duties, Burger is responsible for "maintaining and overseeing 'media', *i.e.*, the loan agreements, account purchase and transfer information, debt collection records and other account information pertinent to accounts and debts that [Midland Credit Management] manages for Midland Funding." (ECF No. 14 at ¶1). He also states the third party records "have been incorporated into the business records of [Midland Credit Management] and are routinely relied upon by Midland Defendants in conducting business." (ECF No. 14 at ¶2). Burger reviewed the business records of Midland Credit Management related to Plaintiff's account. *See* (ECF No. 14 at ¶¶1-3).

Burger also provided specific information related to the purchase of Plaintiff's account from FIA Card Services and attached documents relating to that transaction. *See* (ECF No. 14 at ¶3). Burger states the Cardholder Agreement was included in the records produced by FIA Card Services as "applicable to the FIA account." (ECF No. 14 at 4).

ORDER - 9

The Defendants' interest in the accuracy of the documents furnished by FIA Card Services is obvious and substantial. The Motion to Compel Arbitration is premised on the Cardholder Agreement.

Notwithstanding these facts, Plaintiff argues the Cardholder Agreement lacks indicia of trustworthiness because it is not signed by Plaintiff, language in the Loan Sale Agreement disclaims the accuracy of any documents provided by FIA Services, and the Midland Defendants "have a history of deceptive practices, including the use of robo-signed affidavits to authenticate documents used in litigation." (ECF No. 55 at 7-8). Plaintiff did not produce a copy of what she believes is the document governing her account nor suggest what terms might be different than the ones contained in the 2003 Cardholder Agreement produced by Defendants. Plaintiff's argument challenges the sufficiency of Burger's foundational testimony to show the document is reliable to be what it purports to be.

The fact the Cardholder Agreement has no signatures does not make it unreliable. Burger stated it was provided as part of the documents transferred in the transaction with FIA Card Services and identified as applicable to the FIA account. (ECF No. 14 at ¶8). Burger does not need to know the circumstances of the document's creation at FIA Card Services, he only needs to articulate the record-keeping process for Midland Credit Management. *See Ray*, 930 F.2d at 1370. He personally manages the documents related to the loans Midland purchases which are used and relied upon by Midland Credit Management. *See* (ECF No. 14 at ¶¶1-2). Plaintiff presented no evidence to rebut Burger's declaration.

There is nothing about the Cardholder Agreement undermining its trustworthiness. The Loan Sale Agreement called for Defendants to make their own independent verification of the documents provided while FIA Card Services made no representations about the accuracy or completeness of the information. *See* (ECF No. 46 at 20). The fact the Loan Sale Agreement contained the disclaimer does not suggest the Cardholder Agreement is not trustworthy, especially in light of Defendants' duty to independently

verify the information. The Cardholder Agreement appears on its face to be valid. Plaintiff presented no evidence suggesting the Cardholder Agreement is unreliable or incorrect.

Plaintiff's arguments regarding Defendants' practices in other cases are not germane to this matter. There is no evidence to suggest the Burger declaration is an example of a "robo-signing" affidavit or that there is any false or misleading information contained therein. The evidence does not show the practices described in *Pelzer v. Vassalle*, --- Fed. Appx. ---, 2016 WL 3626825 (6th Cir. July 7, 2016), are present in the instant matter. Additionally, any arguments regarding Defendants' alleged misconduct in the instant matter is unsupported. There is no evidence Defendants have maliciously or intentionally withheld information from Plaintiff or the court. Despite Plaintiff's characterizations set forth in various pleadings, the court does not find any evidence of wrongful acts which would call into question the trustworthiness of the Cardholder Agreement or Burger's declaration.

In light of the undisputed evidence, Plaintiff's request to strike the Burger Declaration and 2003 Cardholder Agreement is Denied. The court treats the 2003 Cardholder Agreement as exemplar of the agreement governing Plaintiff's account. *See Coppock v. Citigroup, Inc.*, No. C11-1984-JCC, 2013 WL 1192632 at *4 (W.D. Wash. March 22, 2013).

**B.    Delegation of Arbitrability**

The arbitration clause in the 2003 Cardholder Agreement provides for arbitration of any claim arising out of or relating to the Cardholder Agreement, including "the validity or scope of any provision of this Agreement, including this arbitration clause." (ECF No. 14 at 15). Notwithstanding this language delegating issues of arbitrability to the arbitrator, Plaintiff contends this court should find the arbitration clause unenforceable based on the *Ross* settlement and the language contained in the Loan Sale Agreement between Midland Funding, LLC, and FIA Card Services, N.A.

As an initial matter, the court finds the arbitration clause in the 2003 Cardholder Agreement constitutes clear and unmistakable evidence of a delegation of the issue of arbitrability to an arbitrator. *See First Options of Chicago, Inc.*, 514 U.S. at 944; *Momot*, 652 F.3d at 988. The issue is whether this court or an arbitrator must evaluate and determine what effect, if any, the *Ross* settlement and Loan Sale Agreement has on the arbitrability of Plaintiff's claims.

In light of the court's finding of clear and unmistakable evidence in the 2003 Cardholder Agreement, this court is bound to defer this issue to arbitration. While it is arguable the *Ross* settlement or terms of the Loan Sale Agreement nullify the arbitration clause, the parties have stated their intent to have issues of arbitrability determined through arbitration. *See Contec Corp. v. Solution, Co., Ltd.*, 398 F.3d 205, 211 (2d Cir. 2005) (holding where there is clear and unmistakable evidence of the parties intent to delegate arbitrability to arbitration, the proper course of action was to allow the arbitrator to determine whether the arbitration clause was valid as to non-signatories to the original contract). Plaintiff's arguments relating to the *Ross* settlement and Loan Sale Agreement directly attack the validity of the arbitration clause in the 2003 Cardholder Agreement, and such an argument must be made to an arbitrator.

Under the FAA, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. This does not forbid the court from dismissing the matter if it is clear all claims are subject to arbitration. *See Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 637-38 (9th Cir. 1988). Here, there is a genuine dispute over whether any of Plaintiff's claims are subject to arbitration and whether her class action claims can proceed as such. The court observes the language in the Loan Sale Agreement appear s to support both Plaintiff's position and Defendants' position. The same is true for the *Ross* settlement. Because it is possible Plaintiff could succeed on the threshold issue of arbitrability and class action claims, it would be imprudent for this court to dismiss this matter. Accordingly, a stay of the proceedings pending arbitration on the threshold issues

1    is appropriate.

2    **C.    Sealed Documents**

3          There is a strong presumption in favor of access to court records. *Foltz v. State*

4    *Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). However, this

5    presumption may be "overridden given sufficiently compelling reasons for doing so."

6    (*Id.*). In determining whether there are sufficiently compelling reasons to keep documents

7    under seal, relevant factors may include "the public interest in understanding the judicial

8    process and whether disclosure of the material could result in improper use of the

9    material for scandalous or libelous purposes or infringement upon trade secrets."

10   *E.E.O.C. v. Erection Co., Inc.*, 900 F.2d 168, 170 (9th Cir. 1990). After considering all

11   relevant factors, the court "must base its decision on a compelling reason and articulate

12   the factual basis for its ruling, without relying on hypothesis or conjecture." *Hagestad v.*

13   *Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995).

14         "[W]hen a party attaches a sealed discovery document to a nondispositive motion,

15   the usual presumption of the public's right of access is rebutted, so that the party seeking

16   disclosure must present sufficiently compelling reasons why the sealed discovery

17   document should be released." *Phillips ex rel. Estates of Byrd v. General Motors Corp*.,

18   307 F.3d 1206, 1213 (9th Cir. 2002). This applies even when the document was filed

19   under seal pursuant to a protective order. (*Id.*). However, this rebuttal is not present when

20   the document is attached to a dispositive motion. *Foltz*, 331 F.3d at 1136.

21         Recently, the Ninth Circuit clarified "public access to filed motions and their

22   attachments does not merely depend on whether the motion is technically 'dispositive.'"

23   *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016). The

24   test is "whether the motion is more than tangentially related to the merits of a case." (*Id.*).

25   If the motion at issue is "more than tangentially related to the merits of a case" then the

26   "compelling reasons" test applies. *See* (*id*. at 1102).

27         The Motion to Compel Arbitration in the instant matter strikes at the heart of

28   Plaintiff's case: whether Plaintiff may bring her claims in federal court and whether she

ORDER - 13

may bring class action claims. The court has found the enforceability of the arbitration clause must be determined by an arbitrator, an issue to which the Loan Sale Agreement and pleadings on the Motion to Compel Arbitration are clearly relevant. Under the Ninth Circuit's expansive "more than tangentially related" test, the court finds the Loan Sale Agreement and Motion to Compel Arbitration are directly related to the merits of the case. Accordingly, to justify the sealing of the Loan Sale Agreement and documents related to the Motion to Compel Arbitration, it is Defendants' burden to demonstrate a compelling reason to do so.

Defendants argue the Loan Sale Agreement should remain sealed because the court found good cause to enter the Protective Order and because the Loan Sale Agreement allegedly has no bearing on Plaintiff's claims. (ECF No. 51 at 5). Defendants also argue against the reasons Plaintiff set forth in favor of unsealing the Loan Sale Agreement. (ECF No. 51 at 5-6). As demonstrated above, it is not Plaintiff's burden to show the Loan Sale Agreement should be un-sealed. It is Defendants' burden to demonstrate compelling reasons to keep the document under seal in light of the public's right to access the court's records. The fact this court entered a Protective Order finding good cause to seal the Loan Sale Agreement is immaterial to determining whether it should remain under seal in connection with the Motion to Compel Arbitration.

Insofar as there may be confidential or proprietary information contained within the Loan Sale Agreement, the bulk of the Loan Sale Agreement is an ordinary contract. Defendants presented no evidence or argument which would allow the court to find the entire Loan Sale Agreement, or the briefs concerning the Motion to Compel Arbitration, should be kept under seal. As such, there is no compelling reason justifying the continued sealing of the Loan Sale Agreement.

For these reasons, the Loan Sale Agreement and all briefs related to the Motion to Compel Arbitration shall no longer be held under seal. However, before the seal is lifted, the court will allow Defendants the opportunity to specify any redactions, along with a specific factual and legal basis, they believe should be made to the Loan Sale Agreement

before it is made part of the public record.

### IV.    Conclusion

The court finds the Burger declaration and 2003 Cardholder Agreement constitute a business record of Defendants and contains sufficient indicia of reliability to be considered in connection with Defendants' Motion to Compel Arbitration. The Motion to Compel Arbitration is Granted for the sole purpose of determining whether the arbitration and class action waiver clauses in the 2003 Cardholder Agreement are valid in light of the *Ross* settlement and Loan Sale Agreement between FIA Card Services, N.A., and Defendant Midland Funding, LLC. While the parties arbitrate these threshold issues, this matter will be Stayed. If the arbitrator determines the arbitration clause is not valid, the case shall proceed in this court. However, if the arbitration clause is valid, this matter will be dismissed without prejudice and the parties shall proceed to arbitrate the merits of Plaintiff's claims.

The court also finds Defendants failed to establish compelling reasons warranting the continued sealing of the Loan Sale Agreement and documents related to the Motion to Compel Arbitration. The court will allow the parties to submit proposed redactions to the Loan Sale Agreement prior to it being made part of the public record.

**IT IS HEREBY ORDERED:**

1.    The Motion to Compel Arbitration (ECF No. 12) is **GRANTED** to the extent set forth herein. This matter is **STAYED** pending arbitration of whether the arbitration and class action waiver clauses applicable to Plaintiff's account are enforceable. While this matter is stayed, the parties shall submit status reports starting **December 1, 2016**, and every **30 days** thereafter apprising the court of the status of arbitration. Upon the completion of arbitration, the parties shall **<u>forthwith</u>** notify the court and provide a copy of the arbitrator's decision.

2.    The Motion to Strike (ECF No. 45) is **DENIED**.

3.    The Motion to Unseal (ECF No. 40) is **GRANTED**. Prior to the unsealing of

the Loan Sale Agreement and documents related to the Motion to Compel Arbitration, the parties shall meet and confer regarding any redactions they believe are necessary.

4.  On or before **Monday, October 17, 2016,** the parties shall submit a status report detailing each redaction the parties agree should be made.

5.  On or before **Monday, October 17, 2016**, the parties shall each file a brief, not to exceed seven pages, regarding redactions for which they disagree. Each disputed redaction shall be identified with specificity and with the legal basis supporting each party's position.

**IT IS SO ORDERED**. The Clerk is hereby directed to enter this Order and furnish copies to counsel.

Dated October 4, 2016.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 16